# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**MARK P. STAFFA,**

      Plaintiff,

    **-vs-**                              **Case No. 13-CV-5**

**WILLIAM POLLARD, DR. DAVID BURNETT,**
**DR. P. SUMNICHT, BELINDA SCHRUBBE,**
**and JAMES GREER,**

      Defendants.

---

# DECISION AND ORDER

---

The pro se plaintiff, Mark P. Staffa, a Wisconsin state prisoner, filed this civil rights action pursuant to 42 U.S.C. § 1983. He was granted leave to proceed *in forma pauperis* on an Eighth Amendment medical care claim based on alleged exposure to communicable diseases at Waupun Correctional Institution (WCI), and the defendants' alleged failure to inform him of and treat him for the diseases. The defendants have filed a motion for summary judgment. For the reasons explained herein, the Court will grant the defendants' motion and dismiss this case.

## I. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324

(1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## II. FACTS[1]

### A. Statement of the Case

Staffa was incarcerated at WCI at all times relevant. Defendant Dr. Paul

---

[1] This section is taken from the Defendants' Proposed Findings of Fact. Staffa did not oppose the defendants' statement of proposed material facts as required under the Local Rules. *See* Civil L.R. 56(b)(2) (E.D. Wis.). The defendants' facts are, therefore, undisputed. *See* Civil L.R. 56(b)(4) (E.D. Wis.); *see also* Fed. R. Civ. P. 56(e)(2).

Sumnicht was employed as a physician at WCI from March 4, 2007 until October 5, 2012. At all times relevant, defendant Belinda Schrubbe was the health service manager in the Health Services Unit (HSU) at WCI. Defendant William Pollard is the warden of WCI. At all times relevant, defendant James Greer was the director of the Wisconsin Department of Corrections' (DOC) Bureau of Health Services (BHS). Dr. Burnett was the Medical Director of BHS at all times relevant.

Pursuant to the Screening Order, Staffa has been allowed to proceed on the following allegations:

> The plaintiff alleges that due to ongoing neglect and failure to follow institution policy and procedures regarding infectious diseases, he has been infected with "MRSA, Impetigo, & [Enterobacter]." (Compl. at 3.) He also alleges that defendants Schrubbe and Sumnicht continually lied to him and told him he did not have a [MRSA] infection when he did in fact have one, and that they failed to properly treat his infection. According to the plaintiff, WCI medical staff withheld information confirming that the plaintiff had MRSA. He has suffered irreversible and damaging effects from the diseases. The plaintiff further alleges that he wrote a multitude of letters to defendants Greer, Burnett, and Pollard informing them that WCI medical staff were not treating his diseases.

(DPFOF ¶ 8).

## B. The Medical Conditions at Issue

Staphylococcus aureus (S. aureus) is a bacteria that is normally found on the skin, or in the nose, of 20% to 30% of healthy people. When an individual has symptoms from S. aureus, it is called an infection and is commonly referred to as a Staph infection. Methicillin-resistant S. aureus (MRSA) is a type of S. aureus

- 3 -

resistant to certain antibiotics. In reviewing laboratory reports, if a culture test indicates susceptibility to Oxacillin, the S. aureus is not MRSA because it is not methicillin resistant.

Enterobacter usually lives in the colon without problems. After a few different oral antibiotic treatments it is more likely to be found in other areas of the body also, including living on the skin without symptoms. If it does cause problems it is usually infection of the fat and muscle layers called cellulitis. It is not known to cause sores or impetigo but is more likely to show up on the culture of sores after oral antibiotics.

Impetigo is an infection localized to the skin that forms crusts and is very contagious. An open sore with yellowish crusts is impetigo, but an open sore without crusts is not. The most common germs are S. aureus, resistant and non-resistant types, and streptococcus. Sores on the skin are often described by different descriptive names such as skin ulcers, blisters, folliculitis, acne, rosacea, and eczema with scaly skin. They each have different treatments, but impetigo with crusts is very contagious in the tight living quarters of a prison. Sometimes eczema and folliculitis will be treated with antibiotics to cover the possibility it may be impetigo and prevent an outbreak.

## C. Staffa's Skin Conditions Before Dr. Sumnicht Started Treating Him

On August 4, 2006, Staffa was seen in the WCI HSU by a nurse practitioner. Staffa reported with a history of medications for dermatology issues since 2003. It was noted Staffa had scabs on his face and chest and his skin was

- 4 -

intact. Staffa was instructed to stop picking at scabs and he was given a tube of bacitracin, which is an antibiotic medicated ointment used to prevent bacterial skin infections commonly caused by small cuts, scrapes, or burns. On August 11, a culture from Staff's facial wound was collected. The August 16 results were positive for a staph species. While Staffa had a staph infection, it was not MRSA because tests showed that the staph was susceptible to Oxacillin. Staffa was then seen for his skin conditions by HSU staff on August 16, September 19, September 28, October 9, October 20 and November 10, 2006.

In 2007, HSU staff saw Staffa for his skin conditions on January 24, February 8, and July 9. On September 19, 2007, Dr. Sumnicht was scheduled to see Staffa per a Health Service Request (HSR) that Staffa submitted. In the HSR, Staffa requested to see a physician because he did not agree with the nurse practitioner's judgment. This would have been Dr. Sumnicht's first appointment with Staffa, but Staffa refused to be seen. Similarly, on January 10, 2008, Staffa was scheduled in response to an HSR, in which stated he needed to be seen for eczema on his skin. Upon arrival at HSU, Staffa stated, "I took care of it myself and don't need to be seen." (Sumnicht Decl., ¶ 25, Schrubbe Decl., Ex. 1001, p. 85; Ex. 1005, p. 14.)

## D. Chronology of Staffa's Health Care for Skin Conditions While Dr. Sumnicht was Treating Him

On February 12, 2008, Dr. Sumnicht saw Staffa, who reported that a rash on his face had been there for twenty-four days. Dr. Sumnicht noted it was a

bubbling rash that could be MRSA. As a precautionary measure, Dr. Sumnicht issued several orders and prescriptions. On February 25, Dr. Sumnicht saw Staffa, who reported itching. Dr. Sumnicht instructed Staffa to apply ointment, and Dr. Sumnicht discontinued the MRSA orders because the results of the culture showed that Staffa did not have MRSA.

On March 10, 2008, Staffa was seen by a nurse in response to a HSR. The nurse noted several bumps over red cheeks and chin, and noted areas on his forehead were flat and scabbed, but no pustules or open areas were present. The nurse consulted with Dr. Sumnicht, and he issued several orders and prescriptions. Dr. Sumnicht also ordered a culture, and the results were positive for Enterobacter, staph species, and mixed skin flora. While Staffa had a staph infection, it was not MRSA because tests showed that the type of staph was susceptible to Oxacillin. On March 27, Dr. Sumnicht met with Staffa for follow-up and ordered an oral medication.

On May 8, 2008, Dr. Sumnicht saw Staffa for follow-up of his reccurring facial sores. Dr. Sumnicht ordered a culture of Staffa's sores and continued a previous prescription. On May 12, Dr. Sumnicht reviewed the results from the May 8 culture and the results indicated that Staffa did not have MRSA.

On December 29, 2008, Dr. Sumnicht saw Staffa. He observed a rash on Staffa's face, arms, and legs. He diagnosed staph folliculitis, which is when skin germs travel down the hair follicles and creates a puss pocket (an infection of the hair follicles). He ordered dicloxacillin, which is an antibiotic used to treat

- 6 -

folliculitis, bacitracin ointment to be used twice per day, and a culture of Staffa's face wound. On January 9, 2009, Dr. Sumnicht reviewed the results from the culture. The results were normal.

On January 14, February 3, and February 16, 2009, Staffa was seen by HSU nurses after he submitted HSRs. Following those appointments, Dr. Sumnicht entered orders, including an order for a culture and antibiotics. On March 20, 2009, Dr. Sumnicht saw Staffa for a follow-up appointment on several issues, including Enterobacter. Dr. Sumnicht assessed Staffa's Enterobacter skin colonization and needed Vitamin D supplementation for low Vitamin D levels. Dr. Sumnicht ordered continued Vitamin D, Omega 3 fish oil, and Miralax.

On June 9, 2009, Dr. Sumnicht saw Staffa for a follow-up appointment on several different medical issues. Dr. Sumnicht observed small scabs on Staffa's arms, neck, and hands. Staffa indicated that he believed that dialysis with IV antibiotic in the hospital was needed to get the staph infection out of his body. Dr. Sumnicht disagreed with this theory and then ordered Vitamin D and a follow-up. On June 18, 2009, Dr. Sumnicht saw Staffa for follow-up. Dr. Sumnicht ordered a culture of Staffa's face wound and minocycline. Minocycline is an antibiotic used to treat infections such as acne; it stops the growth of bacteria and the spread of impetigo. On June 22, Dr. Sumnicht reviewed the culture results which showed Enterobacter aerogenes, and a staph species. Dr. Sumnicht ordered a follow-up appointment and acidophilus, which can help repopulate the colon with healthy germs. Again, while Staffa had a staph

- 7 -

infection, it was not MRSA because laboratory tests showed that the type of staph was susceptible to Oxacillin.

On June 26, 2009, Dr. Sumnicht saw Staffa who complained of a skin rash. Staffa reported that the Micocycline helped some. Dr. Sumnicht noted the Enterobacter was present and the rash was better, and possible other causes for recurring infections. Dr. Sumnicht questioned whether there was immune suppression, cancer, or Hepatitis C. He ordered screening for the other possible causes.

On July 2, 2009, Dr. Sumnicht conducted a file review and reviewed the results of the screening. He considered a zinc deficiency, which can delay wound healing. He ordered a therapeutic trial of zinc.

On July 22, 2009, Staffa met with a nurse per his HSR. The nurse observed red, raised pustules scattered on Staffa's face. The nurse ordered a follow-up with the physician. On July 30, Dr. Sumnicht saw Staffa for follow-up. Dr. Sumnicht noted that Staffa reported he was worried that his organs were infected and toxic. He further noted that Staffa needed to fail Bactroban before he could go to UW-Infectious Diseases for a consultation. Dr. Sumnicht ordered Bactroban and a follow-up.

On August 18, 2009, Dr. Sumnicht saw Staffa for follow-up. The Bactroban and Bacitracin were slowly improving his condition. Dr. Sumnicht observed Staffa's left neck was still raw and red. He increased Zinc supplements to a daily dose, and ordered a culture of his left neck sore and a follow-up

- 8 -

appointment. On August 22, Dr. Sumnicht reviewed the results from the culture. There were no bacteria seen and no growth at 72 hours.

On September 3, 2009, Staffa was seen by a nurse in the HSU in response to his HSR related to a skin outbreak. The nurse ordered a follow-up with the physician. That same day, Dr. Sumnicht ordered a culture of Staffa's right hand wound.

On September 8, 2009, Dr. Sumnicht saw Staffa. Dr. Sumnicht noted continued rash despite Bactroban, but the oral doxycyline kept it suppressed. He observed sores on Staffa's neck and hands. Dr. Sumnicht reviewed the September 3 culture results and noted the results showed no bacteria growth. Dr. Sumnicht ordered doxcyline and a consult with UW Infectious Disease for recurring impetigo. That same day, Dr. Sumnicht completed and submitted a request for the consult. On September 9, the consult request was approved.

On September 20, 2009, Dr. Sumnicht saw Staffa for his complaints of nail fungus. Staffa believed his nail fungus allowed Enterobacter blood infection. Dr. Sumnicht observed no redness or soreness around the right big toenail.

On November 9, 2009, Dr. Sumnicht saw Staffa who complained of sores on his face. Dr. Sumnicht observed new sores developed on Staffa's cheeks under his eyelids. He noted no hydrogen peroxide bubbling and it had failed to heal with Bacitracin. He told Staffa his infectious disease consultation was coming soon.

On November 12, 2009, Staffa was seen by Dr. William Craig at UW's

- 9 -

Infectious Disease. Dr. Craig noted Staffa likely had a dermatologic problem and not impetigo. Dr. Craig ordered a screen to see if Staffa was colonized with MRSA. Dr. Craig indicated that if his infectious disease screen was negative, Staffa should be given a dermatology consult and skin biopsy. Dr. Craig sent Dr. Sumnicht a letter explaining his assessment:

> While I think this represents a noninfectious dermatologic problem, I did feel it was critical to screen him to make sure that he is not infected with MRSA. We also did 1 of the swabs from the nose to see if he is colonized with MRSA from the nose. They all turned out to be negative for staphylococcal. Since the screening is negative for MRSA or nasal colonization with MRSA, I think it is important to refer the patient to a dermatologist where he can get a skin biopsy and get these lesions correctly diagnosed.

(DPFOF, ¶ 63). On November 19, Dr. Sumnicht ordered a follow-up for a dermatology consult.

On December 2, 2009, Dr. Sumnicht saw Staffa for leg numbness. During this appointment, Staffa stated he believed he had collective damage, he was disabled and Dr. Sumnicht was not going to be able to tell him otherwise. Dr. Sumnicht ordered a follow-up for a skin biopsy. On December 15, Dr. Sumnicht ordered Bacitracin ointment daily; three tubes/month for six months. On December 16, Dr. Sumnicht saw Staffa for follow-up. Dr. Sumnicht noted that he continued to develop sores and had about fifteen sores at different stages. Dr. Sumnicht completed and submitted a request for approval for a dermatology consult and skin biopsy. The request was approved on December 17.

On January 11, 2010, Staffa was seen by Dr. Haemel and Dr. Xu at the

- 10 -

UW Department of Dermatology. The doctors' assessment and plan included the following:

> This is a 45-year-old man with recurrent lesions which appear most highly suggestive of some form of folliculitis. The majority of the lesions are indeed follicular based and the differential diagnosis as such includes bacterial, Pityrosporum or even eosinophilic folliculitis. He also has a single lesion on the left 2nd dorsal finger which could be consistent with folliculitis though the location is less typical. Other diagnostic considerations which should be entertained for this lesion include possible eczema/pompholyx. A biopsy will be helpful in further defining the etiology for these recurrent eruptions.

(DPFOF, ¶ 69). On January 27, 2010, Dr. Sumnicht reviewed the results of the culture and biopsy as sent by Dr. Haemel. The results showed bacterial folliculitis and dermatitis.

On April 12, 2010, Staffa was seen by Dr. Rita Lloyd at UW Dermatology. Dr. Lloyd noted that Staffa had recurrent lesions most consistent with acne/folliculitis. Dr. Lloyd recommended that Staffa be on a systemic therapy with doxycycline. In addition, Dr. Lloyd recommended that Staffa use benzoyl peroxide wash daily. Dr. Lloyd indicated this was a chronic problem and Staffa may need to continue on this therapy indefinitely. That same day, Dr. Sumnicht ordered Doxycycline for six months, a continuation of the benzoyl peroxide wash daily, and noted that Staffa may continue on this regimen indefinitely. Dr. Sumnicht also ordered a follow-up.

On April 27, 2010, Staffa was seen by a nurse in the HSU for other medical issues and the nurse noted that Staffa's skin was within normal limits.

- 11 -

Similarly, on July 12, Dr. Sumnicht saw Staffa for other medical issues and he observed that Staffa's skin was better.

On August 9, 2010, Dr. Sumnicht saw Staffa for complaints of pain and headache. Staffa reported that he stopped taking the doxycycline when he broke out. Dr. Sumnicht ordered a follow-up for recurring sores and Vitamin D daily. On September 15, 2010, Staffa was seen by a nurse for follow-up to his sores. Staffa reported he didn't take the doxycycline as prescribed, "I don't take this because I don't think it helps." (Sumnicht Decl. ¶¶ 92-93, Schrubbe Decl., Ex. 1001 pp. 45, 47.) Staffa admitted to scratching and picking at sores. The nurse observed several areas on his face/neck that were flat, red or had scabbed acne-like spots. She noted no drainage and no signs of infections. The nurse gave triple antibiotic ointment and ordered a follow-up with the physician. That same day, Dr. Sumnicht saw Staffa as follow-up to his sores. Dr. Sumnicht noted that Staffa had stopped taking the oral doxycycline and Dr. Sumnicht told Staffa to continue cleansing and use of topical antibiotic ointment.

On September 29, 2010, Dr. Sumnicht saw Staffa for follow-up to his sores. Staffa had new sores to his dermis, right ear, and face. Staffa stated that the Bacitracin was not helping, but the triple antibiotic ointment was helping. Dr. Sumnicht ordered ointment daily for one year, daily saline packet for one year, doxycycline for one year, and a follow-up with himself for facial sores.

On October 25, 2010, Dr. Sumnicht ordered Dakin's solution, which is a buffered dilute bleach solution used to prevent and treat skin infections. It was

- 12 -

to be mixed in HSU and applied to sores as needed for one year. On November 2, 2010, Dr. Sumnicht saw Staffa for follow-up to his facial sores. Dr. Sumnicht observed that his facial sores continued. Dr. Sumnicht noted that UW had recommended dilute bleach. He ordered stronger Dakin's solution to be applied to sores daily for one year and discontinued the triple antibiotic ointment.

On December 27, 2010, Staffa was seen by a nurse for follow-up to his facial wounds. Staffa stated he had yellow drainage under his left eye. The nurse was unable to express any fluid from the lesion below Staffa's left eye. The nurse further noted a superficial scab was forming under his left eye, slight edema was noted and a slightly raised pink area was present on his right ear that had no drainage. That same day, Dr. Sumnicht ordered a culture of the sore under Staffa's left eye. On December 30, 2010, Dr. Sumnicht reviewed the culture results which showed moderate gram positive cocci. On January 3, 2011, Dr. Sumnicht noted that Enterobacter and staph grew from the skin culture. No new treatment was ordered.

On January 12, 2011, Dr. Sumnicht saw Staffa in HSU for complaints of vesicular rash. Dr. Sumnicht noted a follow-up to return to dermatology. The present therapy was continued.

On May 10, 2011, Dr. Sumnicht saw Staffa for follow-up with dermatology. Dr. Sumnicht noted the doxycycline was constipating Staffa. He observed spongiotic dermatitis and folliculitis on the biopsy. He ordered 1% hydrocortisone cream, terbinafine, Dakin's swabs and Benzoyl Peroxide. Dr.

- 13 -

Sumnicht saw Staffa for complaints of headaches. During this appointment, Dr. Sumnicht observed one healing lesion on Staffa's face and a red collarette with scabs on his left thigh. He noted a thigh rash infection – self limited and chronic staph blisters with better control. He ordered Zinc, Selenium Sulfide 2.5% lotion, and Benzoyl Peroxide to 10% cream daily for one year.

On September 2, 2011, Dr. Sumnicht saw Staffa for multiple issues. Staffa reported that the lump on his left rib cage was causing constipation and he felt that it was connected to something else. He also believed that Enterobacter was backing up into his blood stream. He further believed that Enterobacter was leaking into his blood and erupting into his skin. Staffa felt attacked by prison infection issues and abused by the people who were supposed to take care of him. He requested a barium enema to see if there is a fistula between his colon and lump and between his colon and skin. Dr. Sumnicht ordered a barium enema for his constipation.

On December 30, 2011, Dr. Sumnicht saw Staffa for an appointment. During this appointment, Dr. Sumnicht observed a few sores on his face with his beard. Staffa believed he had a system wide staph infection that needed dialysis. There were no new orders for his skin condition.

On May 15, 2012, Dr. Sumnicht saw Staffa for follow-up to the sores on his face. Staffa reported that he stopped his chronic antibiotics and his facial rash improved. Dr. Sumnicht observed indurate bump or red papule that blistered with hydrogen peroxide bubbling. Dr. Sumnicht noted it was an

- 14 -

impetigo type rash in duration/drainage/crust.  He ordered penicillin, a culture of his right cheek, benzoyl peroxide daily for one year, and clindamycin 1% solution for daily use for one year.  On May 21, a nurse practitioner ordered clindamycin 1% topical solution daily for one year for folliculitis.  On May 22, Dr. Sumnicht reviewed the culture results which showed MSSA and Enterobacter.  MSSA is methicillin sensitive staph aureus (in contrast to methicillin resistant staph aureus-MRSA).  Dr. Sumnicht's plan was to treat with topical agents and he ordered a follow-up.

On June 5, 2012, Dr. Sumnicht submitted a request for Staffa to return to the dermatologist.  Dr. Sumnicht also ordered 60 band-aids per month for one year, antibacterial soap daily for one year, and a follow-up appointment with himself for Staffa's anemia.  On June 6, 2012, Dr. Burnett reviewed Dr. Sumnicht's request and approved it.

On July 6, 2012, Dr. Sumnicht saw Staffa for complaints of infections, sores on his face, and red eyes with drainage for three days.  Dr. Sumnicht observed small blistered sores on his face.  Staffa had a H. Pylori infection, skin infection, and conjunctivitis.  Dr. Sumnicht ordered amoxicillin and clarithromycin, which is used to treat bacterial infections. He also ordered a culture of Staffa's eye drainage, a follow-up with him, and a referral for immunology for recurring infections.

On July 11, 2012, Dr. Sumnicht reviewed the July 6 culture results which showed Enterobacter aerogenes, alcaligenes faecalis, mixed skin flora, and

- 15 -

stenotrophomonas maltophilia. Dr. Sumnicht noted the opportunistic germs that grew on the culture. Dr. Sumnicht submitted a referral request with the following comments:

> I'm requesting a referral to Immunology to evaluate recurring skin infections on the face and arms. They are bullae that open up and take weeks to resolve. They are to be Type II delayed immune T cell type response. Culture grows out 2-3 organisms. Usually staph as expected, and also enterobacter aerogenes suggesting fecal contamination. This last culture grew out a third opportunistic infection of alcaligenes faecalis in addition to the other two. Dermatology and infectious disease recommendations have not controlled the recurring infections. This looks like a B cell defective antibody problem with exaggerated T cell response. HIV is neg. Previous serum protein electrophoresis has been ok. Purposeful fecal smearing would create smaller more pustular lesions or cellulitis if the immune response was normal so I don't think that is the problem.

(Sumnicht Decl., ¶ 122, Schrubbe Decl., Ex. 1001, p. 14; Ex. 1001, p. 9; Ex. 1003, pp. 24-25; Ex. 1004, pp. 22-24.) Dr. Sumnicht's request was approved by Dr. Burnett.

On July 26, 2012, Dr. Sumnicht saw Staffa for follow-up. Dr. Sumnicht noted conjunctiva infection after amoxicillin and erythromycin. Staffa still had skin blisters. Dr. Sumnicht observed green matter at the corner of Staffa's left eye and his left conjunctiva was red. Dr. Sumnicht ordered a single cell while Staffa was at WCI due to his numerous opportunistic infections. Dr. Sumnicht also ordered an extra wash cloth for Staffa's face, ofloxacin opththalmic, acidophilus with pectin and a check on the request for an immunology consult.

On August 13, 2012, Staffa had a follow-up with UW-Dermatology. Staffa

- 16 -

had continued folliculitis and excoriations. The Dermatology report included the following:

> At this time, we advised that because the patient has not had much benefit from oral antibiotics in the past that we avoid these and rather use topical measures to prevent overgrowth of bacteria. At this time, we discussed the use of clindamycin gel or lotion daily and/or using chlorhexidine washes on a weekly basis to prevent this overgrowth.
>
> We discussed with the patient that this likely will be more persistent, chronic problem. We also discussed the etiology at length with the patient and discussed that this would not require admission to the hospital or dialysis. If the patient continues to have significant excoriation as part of his disease, a trial of low-dose amitriptyline at night may be considered to treat neurotic excoriations. We advised that the patient follow up with us in 6 months' time to ensure this is helping.

(Sumnicht Decl., ¶ 124, Schrubbe Decl., Ex. 1003, p. 19-23.) During this appointment, dermatology conducted a wound culture. (DPFOF, ¶ 108).

On August 21, 2012, Dr. Sumnicht reviewed a letter he received from UW Dermatology with Staffa's wound culture results. The culture showed "Serratia marcescens, which is a gram neg rod." (Sumnicht Decl. ¶ 126, Schrubbe Decl., Ex. 1003, p. 19.) It also showed moderate growth of this and very little growth of "Coag negative staphylococcus." *Id.* Dermatology advised treatment for Serratia marcescens and recommended Bactrim.

On August 23, 2012, Staffa was seen by Dr. William Craig at UW Infectious Disease for evaluation of his skin lesions. A culture of his skin lesions revealed many coagulase-negative staphylococci and a few Enterobacter aerogenes, which only reflected colonization. Staffa's nares (nasal opening) were

positive for MRSA, but it was simply a colonization of MRSA in the nose. There was no MRSA found in his skin wounds. Dr. Craig recommended penicillin and minocycline for treatment.

On September 26, 2012, Dr. Sumnicht noted that infectious disease recommended penicillin and minocycline. Dr. Sumnicht ordered a follow-up with Staffa to discuss recommended treatment. He further noted no immune deficiency was detected. On September 27, 2012, Dr. Sumnicht saw Staffa for follow-up to his infectious disease appointment. They discussed the findings and recommended treatment. The polymerase chain reaction was negative, which showed the MRSA colonization had cleared. They discussed an increase in "anti-streptolysin" and increased "anti dnase B" as well as penicillin. Dr. Sumnicht ordered penicillin twice a day, before breakfast and dinner, for six months.

In October 2012, Dr. Sumnicht transferred to Green Bay Correctional Institution and his involvement in Staffa's healthcare ended at that point.

**E. Medical Opinions of Dr. Sumnicht**

Staffa alleges that he contracted a staph infection, MRSA, Impetigo and Enterobacter due to ongoing neglect and DOC personnel's failure to follow institution policy and procedures regarding infectious diseases. It is Dr. Sumnicht's opinion, to a reasonable degree of medical certainty, and based on his review of Staffa's medical records and his interactions with him, that Staffa is incorrect. Specifically, Dr. Sumnicht believes that Staffa's skin conditions are of a chronic nature and are not attributable to the actions or inactions of any DOC

- 18 -

personnel.  Dr. Sumnicht further notes that the flare-ups of Staffa's skin conditions often occurred as the likely result of Staffa's failure to practice best hygiene practices and Staffa's failure to follow through on recommendations by health care providers.

It is Dr. Sumnicht's opinion, to a reasonable degree of medical certainty, and based on his review of Staffa's medical records and his interactions with him, that Staffa only tested positive for MRSA on one occasion.  Specifically, the culture from August 23, 2012, test showed Staffa's nares were positive for MRSA. The colonization of MRSA found in August 2012 was cleared in September 2012.

Very serious Enterobacter infections come from catheters and spread in the blood stream with fever and high white blood cell counts. Staffa did not have fevers or high white blood cell counts at any visit.

A patient may have a skin sore with no crusts, but has staphylococcus aureus growing on the culture.  A physician's treatment decision is then based on whether the physician thinks it is just a contamination or whether the physician thinks it is the start of impetigo that might be contagious.  This is the very situation Dr. Sumnicht faced with Staffa.  The lack of response to different topical and oral antibiotics led Dr. Sumnicht to conclude that the ulcers came on their own and the bacteria found on culture had colonized the sores. Impetigo is not a serious, invasive, or life threatening condition.  The indication for antibiotics is to control the spread to other inmates.

It is Dr. Sumnicht's opinion, to a reasonable degree of medical certainty

- 19 -

based on his review of Staffa's medical records and his interactions with him, that DOC medical staff, including Dr. Sumnicht, have appropriately diagnosed, treated, and managed all of Staffa's conditions at issue in this lawsuit. During the entire time period that Dr. Sumnicht worked with Staffa as a patient, Dr. Sumnicht used his professional judgment in all decisions with regard to Staffa's medical care. It is Dr. Sumnicht's belief, based on his knowledge and expertise as a physician, that Staffa's skin conditions have been appropriately addressed based on the standard of care.

**F. Staffa's Communications with Schrubbe**

During the time period relevant to this case, July 2006 to January 2013, Staffa submitted numerous HSRs and Interview/Information Requests relating to his skin conditions. Schrubbe responded to, or participated in the response of, some of those HSRs.

On October 3, 2006, Staffa submitted a HSR in which he wrote, "I need to be seen for this ongoing problem with my skin. It has been 3 months and it still has not cleared up since I was prescribed the Erythomycin and is still causing breakouts on my face and chest." (Schrubbe Decl., ¶ 12, Ex. 1000 at p. 39.) On October 4, 2006, Schrubbe responded to the HSR and noted that Staffa would have a sick call appointment. On October 9, 2006, Staffa was seen by a HSU nurse.

On October 13, 2008, Schrubbe sent Staffa a memorandum because she was informed that Staffa had refused a medical appointment. Schrubbe informed

Staffa that Dr. Sumnicht wanted to review his abnormal MRI and possible treatment options. She advised him that if he wanted to be treated, he needed to keep his appointments. She acknowledged that his last appointment was canceled, but explained that it was canceled because the doctor needed to attend to an emergency elsewhere. She rescheduled his appointment with Dr. Sumnicht.

On October 25, 2008, Staffa submitted an Interview/Information Request in which he did not make any comments but he checked the box indicating he wanted information. On October 30, 2008, Schrubbe responded to Staffa and told him, "Dr. Sumnicht does not have much control over scheduling. You are scheduled to see him next week. He is your primary care physician and he will determine if you are seen offsite. You need to work with Dr. Sumnicht." (Schrubbe Decl., ¶ 14, Ex. 1000 at p. 38.)

On December 30, 2008, Staffa sent Schrubbe a letter that stated as follows:

> I am writing you to ask you how is it I have contracted staff infection yet again, when I have been in seg. for 9 months? Just after I was infected, a lump developed on my left rib cage, but when I showed Dr. Sumnicht last year, he dismissed it as being a fatty lump, knowing full well that another inmate had the same type of lump and he had to put a drain in it. I was treated 4x for this infection, and until this lump is drained, I am going to keep being re-infected. The question formost on my mind, is how much damage has already been done to my heart, liver and kidneys? I have been more than compliant in following Dr.'s orders; I would like to speak with you, as I am waiting for surgery on my neck; but until this infection is completely gone, I will not allow any further surgery on by body. Please address this issue as soon as possible, I am very

- 21 -

concerned for my physician well being and would appreciate your
help.

(Schrubbe Decl., ¶ 16, Ex. 1000 at p. 334-6.) On January 9, 2009, Schrubbe sent

a memorandum to Staffa in response to the letter. In her memorandum, she

informed Staffa that his lab results were back and he did not have a staph

infection. She advised him that daily washing and frequent hand washing

prevent infection.

On January 27, May 22, May 28, June 15, August 17, and December 2,

2009, Staffa submitted Interview/Information Requests. Within one week of each

correspondence, Schrubbe responded to Staffa and provided him with

information.

On December 13, 2009, Staffa submitted an Interview/Information

Request stating, "I am wondering how long you are going to allow this charade to

go on? You and Dr. have and continue to violate 306.03 Security Policy 306.04

Employee Responsibility and my 8th Amendment Right to adequate medical care.

It has been 45 months now, your excuses and delays have run out." (Schrubbe

Decl., ¶ 23, Ex. 1000 at p. 21-22.) On December 30, 2009, Schrubbe responded to

Staffa and asked him what his medical need was because Staffa was regularly

seen by HSU for a number of different medical ailments and this request did not

mention what medical care he felt he needed.

On February 3, 2010, Staffa submitted an Interview/Information Request

stating, "Please send me a copy of the Dermatology findings from my visit on

- 22 -

January 11, 2010. Under the open records act, you have to send me a copy."
(Schrubbe Decl., ¶ 24, Ex. 1000 at p. 19-20.)  On February 4, 2010, Schrubbe responded and told Staffa to submit a disbursement for copies. A disbursement is a request from the inmate to have funds withdrawn from his account.

In April, June, and July of 2010, Staffa submitted Interview/Information Requests regarding the charging of co-pays. Schrubbe responded to all three of the information requests. (Schrubbe Decl., ¶ 25-27, Ex. 1000 at p. 15-18.)

On July 25, 2011, Schrubbe responded to a Medication/Medical Supply Refill Request submitted by Staffa. Schrubbe indicated that Staffa could not yet submit his request for a refill of ibuprofen and Dakin's solution because he requested it too soon; he should re-submit it seven days before the medication is gone. Schrubbe advised Staffa to order the Dakin's Solution the following week. Also, Schrubbe indicated that the Benzoyl Peroxide was discontinued and Staffa would need to submit a HSR if an appointment was needed.

On November 15, 2011, Staffa submitted an Interview/Information Request stating, "Nurse Lion just 90 days ago you renewed by bacitracin and hydrocortisone. I am being told again by the med room that by bacitracin cannot be refilled. I am still breaking out with these blisters and need this medication for my skin. Could you please look into this." On November 17, 2011, Schrubbe responded to Staffa and told him, "She did not write for renewal and the Bacitracin expired 2 months ago. She wrote for you to use the shampoo." (Schrubbe Decl., ¶ 30, Ex. 1000 at p. 11-12.)

- 23 -

On July 26, 2012, Staffa submitted an Interview/Information Request along with a letter addressed to Schrubbe. The letter stated:

> I am writing you so that Special Needs can address a very serious ongoing problem. On 8-16-06 I had gotten a blood test that returned positive for staphylococcus; which has now been identified by medical staff as Impetigo. On 1-21-09 I tested positive for Entrobacter also. According to the pamphlets I received on these infections both can be transmitted thru contaminated surfaces, but the Impetigo is highly contagious and I am requested a medical single cell.
> Telling me to keep my hands washed and my living area clean is not protecting the health and safety of other inmates, please take a closer look at this problem. I know that it's your job to down play the seriousness of communicable diseases as much as possible but after 7 yrs. of being abused by Dr.'s unwillingness to hospitalize and then being assaulted by inmate for fear of catching this, it is time my request be granted. As I only have 30 days in seg, please consider my request.

(Schrubbe Decl., ¶¶ 32-33, Ex. 1000 at p. 6-9.) On July 27, 2012, Nurse Meserole responded to Staffa stating, "request referred to HSU manager-special needs." Schrubbe responded stating, "You have a single cell at this time." *Id.* Schrubbe signed off on this response on July 31, 2012.

On August 2, 2012, Staffa submitted an Interview/Information Request stating:

> Unless you are trying to promote the transmission of Impetigo to other inmates, then giving me a single cell is medically necessary. You obviously enjoy making me suffer through creating strife between me and other inmates or you would not be making these threats toward me. After 7 yrs. of suffering with this, and the now permanent scars on my face, you want other men to suffer like this? If you are going to follow up, why don't you try getting me hospitalization for the Impetigo and Entrobacter before it kills me, then by all means follow up.

- 24 -

(Schrubbe Decl., ¶¶ 34-35, Ex. 1000, pp. 4-5.)  On August 2, 2012, Nurse Waltz responded and told Staffa, "Per HSU mngr you are already in single cell in seg. and you are supposed to have single cell until further work up is done." *Id.*

On October 4, 2012, Schrubbe signed an updated Medical Restrictions/Special Needs form for Staffa. This form allowed Staffa the following: a. Extra pillow from October 4, 2012 to October 4, 2014; b. Extra washcloth from July 27, 2012 to January 27, 2013; c. Single cell from October 4, 2012 through Staffa's duration at WCI.

On November 25, 2012, Staffa submitted an Interview/Information Request stating,

> Considering the fact that Dr. Sumnicht ordered me a single because my chronic Impetigo/MSRA infection, why am I being forced to eat in the cell hall? I am having outbreaks everyday/every other day, are we trying to create another epidemic? You know it is just a matter of time before someone ends up catching it from me. It isn't right that you are subjecting all these men to this disease. Belinda, please order me feed cell.

(Schrubbe Decl., ¶ 37, Ex. 1000 at p. 1-2.)  On December 7, 2012, Schrubbe responded to Staffa and told him, "There is no medical need for feed cell. Wash your hands prior to going to chow. Everyone should be practicing universal precaution." *Id.*

## G. Letters to Greer, Pollard and Dr. Burnett

Staffa claims that he wrote letters to Greer, Pollard, and Dr. Burnett regarding the alleged inadequate medical care he was receiving as a DOC inmate.

Greer searched his files maintained at DOC Central, and he was only able

- 25 -

to locate one letter that he personally sent to Staffa. On September 13, 2004, he returned Staffa's letter and informed Staffa that he was required to file a complaint regarding health care through the Inmate Complaint Review System (ICRS).

On December 27, 2011, Warden Pollard received a letter from Staffa; this was the only letter Warden Pollard received from Staffa. Schrubbe responded to the letter by sending Staffa a memorandum about his medical care. Schrubbe reviewed his medical chart in regards to his complaints of a staph infection and its effects on his body/brain. She explained that he did not have any staphylococcus infection at that time, and any past infections did not cause any brain issues. She advised Staffa to continue working with his doctor. She sent a copy of this memorandum to Warden Pollard.

On April 2, 2007, Dr. Burnett responded to a letter sent by Staffa. In his response, he returned Staffa's letter and informed Staffa that he was required to a file a complaint regarding health care through the ICRS using the "Offender Complaint" form, DOC-400. Dr. Burnett instructed Staffa to complete the form and submit it to the Inmate Complaint Examiner at his institution. Dr. Burnett further informed Staffa that it was very important that every health care concern and complaint be routed through the ICRS to ensure that a nurse coordinator reviews it at the Central Office and that it is recorded for tracking and trending purposes. Lastly, he told Staffa that he had the right to appeal the decision of dismissal of an ICRS complaint and Dr. Burnett encouraged him to file an appeal

- 26 -

if he did not agree with the first level decision within the required time frame.

On October 12, 2007, BHS Nursing Coordinator Cynthia Thorpe responded to a letter Dr. Burnett had received from Staffa. Ms. Thorpe responded to Staffa's concerns about an old knee problem and his request for accommodations regarding a lower bunk and climbing stairs. Ms. Thorpe noted that Staffa refused his most recent medical appointment and she advised him to keep future appointments so that the physician could address the issues presented in Staffa's letter.

On December 28, 2011, and August 3, 2012, Dr. Burnett responded to letters sent by Staffa. In both responses, Dr. Burnett returned the letter and informed Staffa that he was required to file complaints regarding health care through the ICRS. Dr. Burnett again reiterated the importance of submitting health care concerns and complaints through the ICRS.

### III. DISCUSSION

**A. Parties' Arguments**

The defendants contend that Staffa's claims fail as a matter of law because he cannot establish a serious medical need and because he cannot establish deliberate indifference by any defendant. The defendants also contend that they are immune from liability under the doctrine of qualified immunity.

Staffa contends that the Court should deny the defendants' motion for summary judgment because there are too many issues of triable fact. He asserts that until the defendants release the medical histories of every inmate ever

- 27 -

housed in his cell, and every nurse and doctor he ever came in contact with, the defendants' request for summary judgment must be denied. (Dkt. No. 91 at 6.) Staffa also states that the defendants have not presented facts to support their claims, only "after the fact" probabilities and opinions, while plaintiff has shown multiple facts of how his rights have been violated. *Id.* According to Staffa, his hygiene was not lacking and his disease was much more aggressive than the defendants are willing to admit. He asserts that his infections were caused by being forced to be housed with inmates known to be contagious. He asserts that one look at Medscape Reference's Enterobacter Infections publication proves his claim that he suffered from multiple infections.

Staffa also filed a sur-reply in which he states that he has responded to the defendants' proposed findings of "fact" and has shown the flawed manner in which these "after the fact" opinions have been misrepresented. (Dkt. No. 104.) He states that his exhibits prove how ineffective medical care was after the defendants' delayed medical treatment for eighteen months.[2] According to Staffa, "deliberate indifference was clearly shown when defendants made a conscious decision not to intervene after having been made subjectively aware of the problem, but disregarded plaintiff's pleas for help when it was clear they had

---

[2] Staffa's exhibit consists of documents already in the record, such as Dr. Sumnicht's Declaration, Warden Pollard's Declaration, Dr. Burnett's Declaration, Mr. Greer's Declaration, Ms. Schrubbe's Declaration, Staffa's medical records, offender complaints, and Interview/Information Requests. Staffa's exhibits also include "witness" statements from inmates, Medscape Reference information on Enterobacter Infections, and Mayo Clinic information about Impetigo.

affirmatively placed Plaintiff in a position of danger he would not have otherwise faced." (Dkt. No. 104 at 1.) He states that his chronic skin condition is "the result of being exposed to 2 water borne bacteria, H-Pylori, & Entrobacter, & exposure to a staph infection." *Id.*

> What defendants are alluding to as material fact, are in actuality, after the fact hearsay opinions that have no factual basis and are completely unproven. As such the defendants are not entitled to summary judgment. Clearly plaintiff has disputed all of the proposed "facts" that defendants have in their motion. While defendants are very skilled at making excuses as to why the practice of medicine has had limited success on chronic infection plaintiff was exposed to, begs the question why did prison officials allow plaintiff to be exposed to begin with?

(Dkt. No. 104 at 1.) Staffa asserts that he was "left to suffer for 8 yrs. & still has not been given the treatment outlined in the Medscape Entrobacter Reference." (Dkt. 104 at 3; *see also* Docket No. 91-1 at 70-78, Exh. 24, Medscape Reference: Enterobacter Infections.) Staffa also contends that the defendants should have provided him access to a list of medical histories of every nurse or doctor who treated him, and every inmate who was housed near him.[3]

Lastly, Staffa filed a motion to file an amended response to the defendants' motion for summary judgment, along with an amended response. In this response, Staffa restates much of his prior arguments. He adds:

> So we must ask knowing the nature & severity of these diseases Plaintiff has been exposed to why did the Director of the Bureau Health Services Michael Greer, & the Medical Director of the Bureau of Health Services Dr. David Burnett, fail to make Dr. P.

---

[3] The DOC does not have such a list. (*See* Dkt. No. 57.)

- 29 -

Sumnicht take a more aggressive medical treatment plan for this plaintiff, after being made subjectively aware that the treatment plaintiff was receiving was not working. Both of these medical professionals having seen this type of infection numerous times were well aware of the many complications that would arise from lack of treatment due to this prolonged infection.

(Dkt. No. 140 at 3.) Staffa requests that the Court undertake an *in camera* review of Nurse Francine Monroe Jennings' medical file as it proves further deliberate indifferent to Staffa's future health and safety, when he was exposed to Nurse Jennings' staph infection as a result of her giving him a TB shot in 2006. (Dkt. No. 140 at 5.) Staffa further states that counsel for defendants is correct that Staffa's skin condition does not constitute deliberate indifference. "No, defendants' complete failure to provide any medical treatment for 18 months, & their refusal to intervene after having been made subjectively aware of the problem does prove their deliberate indifference to Plaintiff's serious medical need." (Dkt. No. 140 at 4.)

## B. Eighth Amendment Law

"The Eighth Amendment safeguards the prisoner against a lack of medical care that 'may result in pain and suffering which no one suggests would serve any penological purpose.'" *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011) (quoting *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009); *see also Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). Prison officials violate the Constitution if they are deliberately indifferent to prisoners' serious medical needs. *Arnett*, 658 F.3d at 750 (citing *Estelle*, 429 U.S. at 104).

- 30 -

Accordingly, a claim based on deficient medical care must demonstrate two elements: 1) an objectively serious medical condition; and 2) an official's deliberate indifference to that condition. *Arnett*, 658 F.3d at 750 (citation omitted). "Deliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Rodriguez*, 577 F.3d at 828 (quoting *Estelle*, 429 U.S. at 104).

A medical need is considered sufficiently serious if the inmate's condition "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would perceive the need for a doctor's attention." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). "A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Id.* (quoting *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010)). A broad range of medical conditions may be sufficient to meet the objective prong of a deliberate indifference claim, including a dislocated finger, a hernia, arthritis, heartburn and vomiting, a broken wrist, and minor burns sustained from lying in vomit. *Id.* at 861 (citing *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007) (collecting cases)). On the other hand, a prison medical staff "that refuses to dispense bromides for the sniffles or minor aches and pains or a tiny scratch or a mild headache or minor fatigue – the sorts of ailments for which many people who are not in prison do not seek medical attention – does not by its refusal violate the

- 31 -

Constitution." *Gutierrez v. Peters*, 111 F.3d 1364, 1372 (1997) (quoting *Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996)).

To demonstrate deliberate indifference, a plaintiff must show that the defendant "acted with a sufficiently culpable state of mind," something akin to recklessness. A prison official acts with a sufficiently culpable state of mind when he or she knows of a substantial risk of harm to an inmate and either acts or fails to act in disregard of that risk. *Roe*, 631 F.3d at 857. "Deliberate indifference 'is more than negligence and approaches intentional wrongdoing.'" *Arnett*, 658 F.3d at 759 (quoting *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir. 1998)). It is not medical malpractice; "the Eighth Amendment does not codify common law torts." *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008) (citation omitted).

"A jury can infer deliberate indifference on the basis of a physician's treatment decision [when] the decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Arnett*, 658 F.3d at 759 (quoting *Duckworth*, 532 F.3d at 679). A plaintiff can show that the professional disregarded the need only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, that "no minimally competent professional would have so responded under those circumstances." *Roe*, 631 F.3d at 857 (quotation marks omitted). However, a prisoner "need not prove that the prison officials intended, hoped for, or desired the harm that transpired." *Walker*

- 32 -

*v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002). "Nor does a prisoner need to show that he was literally ignored." *Arnett*, 658 F.3d at 759 (citing *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). That the prisoner received some treatment does not foreclose his deliberate indifference claim if the treatment received was "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate his condition." *Arnett*, 658 F.3d at 759 (quoting *Greeno*, 414 F.3d at 653). However, deliberate indifference is a high standard; it requires proof that the state officials actually knew of the inmate's serious medical need and that they disregarded it. *Walker*, 293 F.3d at 1037.

Here, the Court assumes that Staffa's skin condition is a serious medical need. *See Roe*, 631 F.3d at 857. The Court will focus on the deliberate indifference prong of an Eighth Amendment claim.

## C. Discussion

### 1. Dr. Sumnicht

Staffa contends that Dr. Sumnicht was deliberately indifferent to the conditions that Staffa was forced to endure and that he did not provide adequate medical care. Staffa asserts that he was denied treatment for eighteen months. The factual record, however, does not support Staffa's contentions.

It is undisputed that Dr. Sumnicht treated Staffa for his skin conditions from February 12, 2008, until Dr. Sumnicht transferred to another institution in October 2012. The record reveals that Dr. Sumnicht saw Staffa numerous times. He ordered multiple skin cultures and all of the cultures, except the one August

- 33 -

2012, were negative for MRSA. After about a year and a half of treating Staffa onsite with different medications and treatments, in September 2009, Dr. Sumnicht ordered a consultation with UW Infectious Disease for recurring impetigo. Dr. Craig at UW Infectious Disease opined that Staff had a noninfectious dermatologic problem and determined that he did not have MRSA. Dr. Craig recommended that Staffa see a dermatologist and Dr. Sumnicht ordered that consultation. At his UW Department of Dermatology consultation in January 2010, Dr. Haemal and Dr. Xu saw Staffa and, following a culture and biopsy, stated that he had bacterial folliculitis and dermatitis. In April 2010, Staffa saw Dr. Lloyd at UW Dermatology and she determined that he had recurrent lesions most consistent with acne/folliculitis, that he had a chronic problem, and that he might need to continue therapy indefinitely. She recommended treatment, and Dr. Sumnicht followed the treatment recommendation. In August 2010, Staffa stopped taking his prescribed doxycycline medication because he did not think it helped. Dr. Sumnicht tried different medications for Staffa's recurring skin conditions, including Dakin's solution, which UW doctors had recommended. He also tried doxycycline, hydrocortisone cream, terbinafine, Dakin's swabs, benzoyl peroxide, zinc, and selenium sulfide lotion. Later, when Staffa's skin condition did not improve, Dr. Sumnicht ordered penicillin, another skin culture, and clindamycin. In June 2012, Dr. Sumnicht submitted a request for Staffa to return to the dermatologist. Staffa was seen by UW Dermatology on August 13, 2012, and by

- 34 -

Dr. Craig at UW Infectious Disease on August 23, 2012. At that time, Staffa's nares, or his nasal openings, were found to be positive for MRSA. There was no MRSA in his skin wounds. Dr. Sumnicht followed the specialists' recommendations for treatment. The MRSA cleared in September 2012.

Staffa disagrees with the treatment he received and he also contends that he should not have contracted the skin conditions in the first place. Disagreement with a doctor's medical judgment is not enough to prove deliberate indifference. *Petties v. Carter*, 2015 WL 4567899, at *3 (7th Cir. July 30, 2015) (citing *Berry v. Peterman,* 604 F.3d 435, 441 (7th Cir. 2010)). Rather, Staffa must show that Dr. Sumnicht's treatment strayed so far from accepted professional standards that a jury could infer he acted with deliberate indifference. *Id.* (citing *McGee v. Adams,* 721 F.3d 474, 481 (7th Cir. 2013)).

Staffa has not shown that Dr. Sumnicht's treatment strayed from accepted professional standards. He has not submitted evidence calling into question Dr. Sumnicht's treatment choices. His citation to the Enterobacter publication does not call into question Dr. Sumnicht's treatment.

Staffa's belief that he did not receive adequate care amounts to no more than a refusal to accept the professional judgment of his treating physicians. *See Berry,* 604 F.3d at 441; *Johnson v. Doughty,* 433 F.3d 1001, 1012-13 (7th Cir. 2006). Staffa's lay opinions as to the treatment he received and as to how he contracted his skin conditions are not evidence that Dr. Sumnicht's treatment decisions were such a "substantial departure from accepted professional

- 35 -

judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Estate of Cole v. Fromm,* 94 F.3d 254, 261-62 (7th Cir. 1996); *see Johnson,* 433 F.3d at 1022-23.

While at WCI, Staffa had chronic skin issues. Far from acting with deliberate indifference, the record reveals that Dr. Sumnicht diligently treated him for his chronic skin conditions, referred him to multiple specialists, and followed their treatment recommendations. A reasonable factfinder could not conclude that Dr. Sumnicht acted with deliberate indifference. Accordingly, the Court will grant the defendants' motion for summary judgment as to Dr. Sumnicht.

### 2. Nurse Schrubbe

Staffa contends that Schrubbe lied to him when she told him that he did not have a staph infection, knowing that his chronic impetigo was a staph infection. However, the factual record conflicts with Staffa's unsupported assertions. The record reveals that Schrubbe responded to some of Staffa's HSR's and referred him to a doctor for others. She timely responded to his medical concerns, in line with the ongoing care he received from Dr. Sumnicht.

Although nurses may generally defer to instructions given by physicians, they have an independent duty to ensure that inmates receive constitutionally adequate care. *Perez v. Fenoglio*, 2015 WL 4092294, at *6 (7th Cir. July 7, 2015) (citing *Berry,* 604 F.3d at 443)). Nurses may thus be held liable for deliberate indifference where they knowingly disregard a risk to an inmate's heath. *See id.*

- 36 -

(citation omitted). "[A] nurse confronted with an 'inappropriate or questionable practice' should not simply defer to that practice, but rather has a professional obligation to the patient to 'take appropriate action,' whether by discussing the nurse's concerns with the treating physician or by contacting a responsible administrator or higher authority." *Id.* (quoting *Berry*, 604 F.3d at 443)*; see also Rice ex rel. Rice v. Correctional Med. Servs.,* 675 F.3d 650, 683 (7th Cir. 2012) ("[A] nurse may not unthinkingly defer to physicians and ignore obvious risks to an inmate's health....").

The factual record does not support a finding that Schrubbe lied to Staffa or that she acted with deliberate indifference to his medical needs. Rather, she treated him and referred him to the doctor, who provided treatment in accordance with the professional standard of care. The Court will therefore grant the defendants' motion for summary judgment as to Schrubbe.

### 3. Warden Pollard, Dr. Burnett, and Greer

Staffa contends that Warden Pollard's assertion that he was not personally involved in Staffa's medical care demonstrates that he is liable. According to Staffa,

> [Warden Pollard's] decision not intercede on Plaintiff's behalf after he was made aware by Plaintiff of his having been exposed to 3 serious identifiable contagious diseases in his prison & not questioning medical staff, or making it mandatory Plaintiff be given immediate sick cell/feed cell, until Plaintiff's infection was gone, was a violation of his ministerial responsibility[.]

(Dkt. No. 90 at 1.) Staffa also contends that he notified defendant Greer and Dr.

- 37 -

Burnett that, over a period of years, he had not received adequate medical treatment, and that when Greer and Dr. Burnett did not intercede on Staffa's behalf, they denied him the basic necessities of life.

It is well established that "[f]or constitutional violations under § 1983 . . . a government official is only liable for his or her own misconduct." *Perez*, 2015 WL 4092294, at *8 (citing *Locke v. Haessig,* 788 F.3d 662, 669 (7th Cir. 2015)). Thus, to recover damages against a prison official acting in a supervisory role, a § 1983 plaintiff may not rely on a theory of *respondeat superior* and must instead allege that the defendants, through their own conduct, have violated the Constitution. *Id.* (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009)). Deliberate indifference may be found where an official knows about unconstitutional conduct and facilitates, approves, condones, or "turn[s] a blind eye" to it. *Id.* (citing *Vance v. Peters,* 97 F.3d 987, 992-93 (7th Cir. 1996)).

An inmate's correspondence to a prison administrator establishes a basis for personal liability under § 1983 where that correspondence provides sufficient knowledge of a constitutional deprivation. *Id.* (citing *Vance,* 97 F.3d at 993 ("[A] prison official's knowledge of prison conditions learned from an inmate's communications can, under some circumstances, constitute sufficient knowledge of the conditions to require the officer to exercise his or her authority and to take the needed action to investigate and, if necessary, to rectify the offending condition.")). Once an official is alerted to an excessive risk to inmate safety or health through a prisoner's correspondence, "refusal or declination to exercise the

- 38 -

authority of his or her office may reflect deliberate disregard." *Id.; accord Arnett,* 658 F.3d at 756. Prisoner requests for relief that fall on "deaf ears" may evidence deliberate indifference. *Id.* (citing *Dixon v. Godinez,* 114 F.3d 640, 645 (7th Cir. 1997).

Here, the record reveals that Pollard received one letter from Staffa and that Schrubbe responded to Staffa on Pollard's behalf. Shrubbe sent Staffa a memorandum about his care, stating that he not did have a staph infection and that he should continue working with his doctor. Next, it is undisputed that Greer sent Staffa a letter in 2004, a time period that is not relevant to Staffa's claims. He advised Staffa to file a complaint through the ICRS related to his medical care issue. Lastly, Dr. Burnett responded to three letters sent by Staffa by informing him that he should file complaints regarding health care through the ICRS. Dr. Burnett also approved Dr. Sumnicht's request for Staffa's referrals to outside providers.

Pollard, Greer, and Burnett were not personally involved in Staffa's medical care. In addition, they did not ignore or turn a deaf ear to Staffa when he wrote them. Rather, they referred the communications to a direct provider who then responded, or they responded with information regarding the steps Staffa should take to seek review of his treatment. Based on the foregoing, a reasonable factfinder could not conclude that Pollard, Greer, or Dr. Burnett were deliberately indifferent to Staffa's medical needs.

- 39 -

## Additional Matter

Staffa has filed a motion to remove the Clerk of Court for misconduct relating to payment of a $5 partial filing fee. Staffa apparently believes that the Clerk's Office erroneously misapplied his $5 partial fee payment toward outstanding court fees without a court order to do so. Contrary to Staffa's motion, the Clerk's Office has diligently attempted to accommodate Mr. Staffa with regard to the filing fee in this case and in his three related appeals.

The filing fee history in this case is complicated because it involves not only the $350 filing fee for commencing this action, but also three appeal fees (one for $455 and, after the appeal fee increased, two for $505) for each of the three interlocutory appeals that Staffa filed throughout the course of this case. Staffa is proceeding *in forma pauperis*, so the Court assessed an initial partial filing fee in this case and in two of his three appeals; the Court waived the initial partial filing fee in his third appeal.

On June 3, 2014, the Clerk's Office receive a $5.00 payment from a Mr. John Schone for payment of the filing fee on Appeal No. 14-2124. The Clerk responded that since the Court had not yet assessed the initial partial appeal fee in Appeal No. 14-2124, it applied the payment to his outstanding filing fees already incurred (from this case and from his first appeal, No. 13-2588). When the Court granted Staffa's petition to proceed *in forma pauperis* on appeal and assessed a $0.25 initial appeal fee in No. 14-2124, the Clerk applied the $5.00 to the initial appeal fee.

- 40 -

Similarly, on August 20, 2014, the Clerk received $5.00 from John Schone for payment of the appeal filing fee in Staffa's third appeal, No. 14-2734. At that time, the Court had not yet granted Staffa's petition to appeal *in forma pauperis*, and the Clerk returned the $5.00 to Mr. Schone. The Court granted Staffa's petition on September 11, 2014, and it waived the initial appeal fee due to a lack of funds.

To date, the Court has ordered Staffa to pay $1,310 in filing fees in this matter.[4] The Clerk has received $66.32, leaving a balance of $1,243.68 at this time.

Lastly, although the Court assessed the $.25 initial partial appeal fee in No. 14-2124, the Court inadvertently neglected to order the collection the remainder of the appeal fee in No. 14-2124 ($499.75)[5], and it will do so in this order.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT** the defendants' motion for summary judgment (ECF No. 81) is **GRANTED**.

**IT IS FURTHER ORDERED** that the plaintiff's motion to remove clerk for misconduct (ECF No. 136) is **DENIED**.

---

[4] This amount is the $350 filing fee for this case, the $455 appeal fee for No. 13-2588, and the $505 appeal fee for No. 14-2734.

[5] The balance accounts for the $.25 initial appeal fee that Staffa paid and the $5.00 check from John Schone that the Clerk's Office applied to the appeal fee.

**IT IS FURTHER ORDERED** that the plaintiff's motion for leave to file amended response (ECF No. 140) is **GRANTED**.

**IT IS FURTHER ORDERED** that that the Secretary of the Wisconsin Department of Corrections or his designee shall collect from the plaintiff's prison trust account the $499.75 balance of the appeal fee in Appeal No. 14-2124 by collecting monthly payments from the plaintiff's prison trust account in an amount equal to 20% of the preceding month's income credited to the prisoner's trust account and forwarding payments to the clerk of the court each time the amount in the account exceeds $10 in accordance with 28 U.S.C. § 1915(b)(2). The payments shall be clearly identified by the case name and numbers assigned to this action.

**IT IS ALSO ORDERED** that copies of this order be sent to the warden of the institution where the inmate is confined and to PLRA Attorney, United States Court of Appeals for the Seventh Circuit, 219 S. Dearborn Street, Rm. 2722, Chicago, Illinois 60604.

Dated at Milwaukee, Wisconsin, this 25th day of August, 2015.

**BY THE COURT:**

**HON. RUDOLPH T. RANDA**
**U.S. District Judge**

- 42 -